MAY HOSIERY MILLS, Inc., v. F. & W. GRAND 5-10-25 CENT STORES, Inc.

No. 1301.

District Court, D. Montana.

May 18, 1932.

Kremer, Sanders & Kremer, of Butte, Mont., for plaintiff and its counsel, respondents.

Stewart & Brown, of Helena, Mont., for defendant and its counsel, respondents.

W. D. Rankin, of Helena, Mont., amicus curiæ.

BOURQUIN, District Judge.

March 22, 1932, in the clerk's office counsel filed complaint and answer, and, presenting them to the court with an order-form, applied for ancillary receivers, preferably those three days before appointed in original proceedings in the Southern District of New York. In addition was a rejected tender of some letter and information the like ancillary presently had been or would be sought and granted in some forty federal districts wherein are located some one or more of defendant's more than one hundred stores. The complaint, by a simple contract creditor in behalf of itself and all others who so elect, incorporates the original complaint, in substance that, to plaintiff defendant owes, and on demand failed to pay, $3,482.89; that it owes $2,475,000 due or coming due, and it is or will be unable to pay; that defendant is a going concern of many stores and leaseholds, some for expansion, with assets exceeding liabilities, its cash in banks is $450,-000, and its "realizable quick assets exclusive of cash and merchandise" are $175,000; that its credit is impaired, it is or will be unable to keep stocked, and to discontinue business would involve loss, to avoid which it is necessary the court appoint receivers and carry on the business; that other creditors now or will press their claims and will hamper defendant to its and their loss; and that, did plaintiff proceed at law, like loss would result.

The prayer is as usual and for receivers and continuous operation of the business, to perform defendant's existing contracts "to the extent performance shall seem profitable," to enjoin creditors from proceedings to recover their dues, to adjudicate claims, compromise, compound, settle, sell and pay or return the properties and business to defendant "if and to the extent that provision shall be made for the claims" of creditors.

In New York, as here, answer simultaneously filed admits all alleged and joins in the prayer. Forthwith, in New York, Green and Irving Trust were appointed receivers to function as prayed, save, naturally as will appear, without direction to close out, sell and pay creditors, and also naturally with

special admonition that "leases" are included in contracts to be repudiated if performance does not "seem profitable."

Green is defendant's executive vice president, in the circumstances an appointment appropriate to the end sought, but obviously impossible, if not downright indecent. See Harkin's Case, 276 U. S. 54, 55, 48 S. Ct. 268, 72 L. Ed. 457. And it seems Irving Trust is the stock or standing receiver set up by the courts to some disarm (if not intimidated by) the vicious propaganda of certain of the bar who insist it is their prerogative to dictate the appointment of their friends as receivers, strikingly illustrated by Hardy's Case (D. C.) 20 F.(2d) 968, and by this at bar, and who criticize and condemn courts which assert, as they indubitably should, their right and duty, not only to appoint disinterested receivers, but also, in the person of the court's qualified friends to that office of alter ego, judicial representative, trusted hand and confidential agent of the court which a receiver is. Those objecting to the courts' friends are desirous of their own friends, with contemplated advantage, profit, and emolument.

After due consideration, taking the pleadings by four corners, looking through forms to discover intent, assuming at least the perspicacity of the average man, ignoring conclusions, giving due weight to facts, having in mind the principles of pleading and equity and the federal statute (Judicial Code § 37 [28 USCA § 80]), it is clear that the proceedings are collusive, sham, fictitious, in bad faith, of ulterior motive, for the benefit of defendant alone; that there is no showing of necessity in creditors' behalf, no reasonable inference from the facts alleged that without receivership they would lose a dollar; that plaintiff's case-made has adequate remedy at law, and without need to pursue it by scores of counsel in forty jurisdictions, even though at defendant's expense, and is not within equity jurisprudence if within like jurisdiction; that to accomplish the illegal end sought, and as a party to the conspiracy, the aid of the court is solicited; that the latter's co-operation by injunction and receivership would be abuse of the power of the court though within it, in disregard of its right and duty, and perversion of process to the injury of creditors and others without notice and not before the court.

A court of equity should not thus work inequity and convert the temple of justice to a place of injustice. No doubt defendant owes plaintiff, but none the less the case-made, by reason of procedure, motive, strategy, and object, is sham, fictitious, collusive, an affront to equity, insolent, and an imposition upon the court. The suit is all-fours Hardy's Case, supra. Plaintiff is a dummy or mere "tool" of defendant, and the proceedings are "collusive," to adopt the characterization of Chief Justice Taft in the like and later Harkin Case, supra. The only reasonable inference is that the prime object of this suit is receivership as final relief, and unwarranted injunction and moratorium at creditors' expense; is to hinder and delay and so to defraud and oppress creditors; is to enable defendant by its executive vice president receiver to work its will with creditors; is to rid itself of unprofitable leases and other contracts, by repudiation, compromise, settlement on his terms, and to the disadvantage of creditors coerced by the delay and expense of receivership indefinite if not for life prolonged. A creditor in these circumstances thus delayed a day in collection of money presently due him is defrauded.

If the scheme be furthered by the co-operation of, say, an amiable court, what is it but employment of the judicial club to beat off and hold up creditors until, wearied, they settle with or wait the pleasure of the debtor's executive vice president receiver shielded by the judicial gown? That the like is not uncommon is unfortunately true, is a scandal to courts of equity, undermines vital confidence in their impartiality, lessens essential respect due them in so far as their administration merits it and not at all to their antiquated silken gown, impairs necessary prestige and real usefulness, and is of the abuses which incite congressional limitation of the jurisdiction of federal courts until soon they will be little more than police courts, incite amongst others the pending Norris Bill which, enacted as in due time it will be, will end all that jurisdiction based on diverse citizenship as are the instant proceedings and receiverships in general.

There is doubt that thus the problem will be solved, evil checked, situation bettered; but there is no doubt that Congress is resolved, come what may, abuse of the power of federal courts in behalf of the strategy and aggressions of wealth and corporate power in receiverships, injunctions, periodical reorganizations of great profit to the promoter and "reigning family," and what not, shall be ended. A better remedy might be applied. "Wherever reposed, power is abused; but any argument for that reason to withhold it, is headed straight for anar-

chy," said the great Marshall. Mere shift in the repository of power or change in the mechanics of courts goes for little or nothing. The judge is the court, what he is it is, and power is exercised accordingly. See Great Falls Gas Case (D. C.) 39 F.(2d) 177. A chancery receivership to possess a mercantile corporation's property, oust its proper management by its stockholders instituted, operate its business, and enjoin its creditors, has no justification in principle unless the corporation be insolvent, by reason of which its property becomes a trust fund or estate for all its creditors as beneficiaries, and so a proper subject for administration in equity sought as final relief in their behalf.

Any these jurisdictional elements absent and receivership as a temporary expedient to serve some corporate end, is to hinder, delay, and defraud creditors, quasi a crime, and to abuse the process of the court. Not the debtor's interests, but the creditors' rights, are the chief concern of equity, and the principal, if not sole, ground for receivership. This extraordinary remedy granted to afford even an embarrassed corporation a breathing spell, or to enable it to delay proceedings at law and a scattered multitude of small and disorganized creditors, or to afford opportunity to repudiate unprofitable contracts, is the antithesis of equity and in nature criminal. There is neither principle nor precedent of authority to the contrary. As a rule, the abuse is confined to corporations. Rarely have individuals the temerity to seek and, whatever the "it," to secure its advantages. So far as comity is involved, it always should yield to justice, even though it sometimes does not. See Central Union Case (D. C.) 26 F.(2d) 675.

Without further comment or citation, save to the somewhat analogous Link Belt Case, 195 Ill. 413, 63 N. E. 186, 59 L. R. A. 673, and the Prudential Case, 49 Mont. 571, 144 P. 158, it is obvious that for want of equity the application should be denied as it has been, and the suit dismissed as it is.

Slight is the probability, however, that any protest or voice crying in the wilderness will inspire repentance, make straight the way, or save this jurisdiction surely marked for destruction. But come that fatal day as come it will, to the ghost of our murdered authority which will not down, but rise to reproach us, this court, with a clear conscience, can protest, "Thou canst not say I did it."

Denial of the application was followed by an order to parties and counsel to show cause, if any had, why their approach, solicitation, attempt aforesaid should not subject them to discipline as for contempt within the doctrine of Lord's Case, 8 How. 251, 12 L. Ed. 1067, and Cleveland's Case, 1 Black, 419, 17 L. Ed. 93.

From their response it appears that in limine counsel for plaintiff received from the parties' New York counsel their joint letter and telegrams, and also the pleadings and order form herein. The letter is dated March 17, 1932, advises that receiverships will be sought to conserve the defendant's assets for the benefit of all its creditors; and to facilitate simultaneous ancillary proceedings in forty or more states, it is "not planned to file the papers" in New York "until March 19th," as they were. Of course, it accurately forecast the appointment of Green and Irving Trust, the former's appointment "deemed necessary in order to preserve the continuity of the Company's business in receivership with the least possible interruption," hopes for their like appointment here for co-ordination "during receivership," and without bonds, for otherwise will be delay, and "one of the principal purposes of the program which has been adopted will be defeated"; directs that counsel be procured to appear and file the answer for defendant, and that they jointly "arrange a program to present the papers to a judge" of this court immediately on receipt of a telegram of appointment of receivers in New York.

Following directions, counsel for plaintiff did procure counsel for defendant, and together they proceeded herein as aforesaid. Counsel testify to and argue the rectitude of their intentions, good faith, absence of disrespect for the court, messenger boy nature of their participation, mere instrument of New York counsel, and "leaders of the bar according to Who's Who," regularity assumed, casual perusal and no analysis of pleadings, settled usage and customary tactics and procedure, common-place character of the proceedings, judicial precedent, and in many other districts in the instant suit, absence of statutory collusion, the power to appoint in any event, no thought of impropriety, the distinction from the Lord and Cleveland Cases, no contempt, and the remedy, if any, to merely refuse and dismiss, be even that proper. Of other evidence is Green's affidavit fairly corroborative of the complaint, even imitative in ambiguity and indefiniteness, both, it is emphasized, meticulously careful to avoid disclosure of defendant's total assets and actual condition. Af-

fiant further states in 1931 defendant lost much money, in March, 1932, some 750 creditors were demanding payment of undisclosed amounts in advance of the expiration of the usual trade credit periods, the banks gave notice notes would not be extended beyond March 15th, some attachment suits of undisclosed amounts had been begun, defendant solvent was averse to bankruptcy, values depended on continuation of business and would diminish in any creditors' race of diligence, receivership was agreed upon with plaintiff, and the court concluding defendant "needed the protection of a court of equity," appointed receivers not to defeat creditors but to preserve the "assets and going concern value" for creditors and stockholders, and to continue employment of some 3,500 employees.

Attached are defendant's directors' resolutions that the chairman is informed some creditor was about to file suit alleging defendant solvent but without sufficient money or ability to procure it to meet obligations as they mature, and praying for receivership; that the chairman stated defendant had so much notes in banks and other creditors, and was unable to secure extension or additional credit; that, due to inability to secure further credit, defendant "was unable to continue to purchase adequate supplies of merchandise for its stores"; and that it was advisable to admit the allegations and join the prayer of said suit if brought, "for the benefit of this corporation, its creditors and stockholders."

It is noted the resolution does not even say defendant could not pay obligations maturing, but only that some creditor might say so. And, as it lacked credit to continue buying stock in trade, it was for that reason advisable to admit the charge if made and secure the advantage of receivership.

If aught in addition to pleadings and order form was necessary to disclose the strategy, motive, and purpose of this receivership, counsels' letter and Green's affidavit would supply it. To conserve assets for creditors is not shown necessary or intended, is mere subterfuge and form through which is perceived the substance and effect, viz. to preserve the peace of defendant and the continuity of the business undisturbed by creditors by and during receivership, and against the day when its program completed, object attained, repudiation, compromise, and settlement effected, defendant can emerge from behind the shield of the court, and, after receivership, continue business even as before and during it. As said the scrivener of the indictment of Hastings prepared after done to death by Gloster, "Who's so gross, that cannot see this palpable device?" and here the courts should have the courage lacking there to say 'tis seen.

■■ The cases by respondents cited from the Metropolitan Ry. Case, 208 U. S. 90, 28 S. Ct. 219, 52 L. Ed. 403, to the Owen Cases (C. C. A.) 54 F.(2d) 497; Id. (C. C. A.) 54 F.(2d) 501, are more to the power than duty of the court, and they are consistent with the views and determination herein, even as the Lord and Cleveland Cases, supra, are like in principle, though distinguishable on the facts. Nothing further is necessary to demonstrate the contempt in the premises disclosed and by the court found, viz. approach, solicitation, and attempt to abuse the power and process of the court, in derogation of its authority, dignity, and justice, tending to oppression and to subject the court to disrespect. In so far as counsel count upon mere errand boy service, thus they might limit their duty to their clients, but could not abdicate their office and its obligations to the court. Apropos the latter, see Frank's Case (D. C.) 53 F.(2d) 129.

That New York counsel are leaders and of Who's Who is of course. The experience, skill, finesse, effrontery, prestige, and impressive personality of counsel of that rank were necessary to devise the plan and program and to impose it upon courts. Unethical practice is by no means limited to the lesser of the bar. It is ventured that the most subtle and effective ambulance chasers operate on golf links, in the club, at the poker table, behind a smoke screen of claim agents, and in collusion with banks and trust companies who are the ostensible advertisers for business the profit of which is divided.

Moreover, like Western Chinamen, all counsel should look alike, in court at least.

It may be true that, on the rare occasions when they failed, like sham and collusive suits have been merely dismissed and no penalty as for contempt imposed. The more reason for a precedent. These abuses, even as all violations of law, are encouraged, increased, and perpetuated by toleration and leniency. They have become a system or even a racket. No doubt counsel intended no personal disrespect to the court, no doubt they are surprised, if not shocked, disgusted, if not horrified, that this court did not accept the usual rôle, play the part or game, assume blindness, and like others permit its use to carry out this sinister plan or program. And

doubtless they at least sympathize with the plaintive and significant alibi of leading (and losing) counsel in the recent steel-merger suit, that it was his "misfortune to try the case before a judge who prior to his elevation had not made the proper contacts!" None the less they knew the facts, the system, the abuse, intended to invoke the aid of the court as they did; and in that is the disrespect and all the intent necessary to contempt, or to most crime for that matter.

Moreover, one of them was of counsel in the Hardy Case, supra, which, though reversed as contrary to comity [(C. C. A.) 22 F.(2d) 62], should have served to restrain participation herein.

Upon the findings aforesaid respondents, save Alf C. Kremer, without knowledge of his partners' activities, are adjudged in contempt of this court, and therefrom, with the mitigating circumstances in mind, it is concluded they be fined in sum $500, of which counsel are holden for $50.

Decree and judgment accordingly.