13810

MONTGOMERY & CRAWFORD, INC., *ET AL.* v. ARCADIA
MILLS *ET AL.*

(176 S. E., 589)

*Messrs. White & Case, Wilton H. Earle, B. F. Martin* and *Price & Poag,* for appellant,

*Messrs. Nicholls, Wyche & Russell,* for respondent,

*Messrs. Perrin & Tinsley,* for Arcadia Mills, respondent.

*Messrs. Haynsworth & Haynsworth,* for respondent,

*Messrs. Lyles & Daniel,* for other respondents,

October 12, 1934. Per Curiam.

The Court has given due consideration to the petition of Bankers' Trust Company, appellant, bearing date October 17, 1934, asking "for further modification of opinion of the Supreme Court," filed October 12, 1934.

As to the first objection mentioned in the said petition, there has been submitted to, and filed with, the Court a stipulation and agreement on the part of Fairforest Finishing Company and Reeves Bros., Inc., by their attorneys, Messrs. Osborne & Butler, which appears to the Court to fully care for all matters connected with the claims of Fairforest Finishing Company and Reeves Bros., and the Court is clearly of the opinion that Fairforest Finishing Company and Reeves Bros. will be, and are, bound by the terms of the said stipulation, and the orders of this Court, as to their respective claims. The objection to the order of the Court on the part of Bankers' Trust Company as to the claims of Fairforest Finishing Company and Reeves Bros. has, therefore, been met, and the petition thereabout need not have further attention of the Court.

As to the matter of the removal of Mr. H. A. Ligon as one of the receivers of Arcadia Mills, or forbidding him from taking part in carrying out the orders of the Court, the Court is of the opinion that there is no reason why Mr. Ligon cannot continue to act as receiver, under the orders of the Court.

The petition of Bankers' Trust Company for further modification of the opinion of the Court is, accordingly, dismissed, and the remittitur will be transmitted forthwith by

the Clerk of this Court to the Clerk of Court of Common Pleas of Spartanburg County.

## ORDER ON PETITION FOR REHEARING

On March 16, 1934, a judgment of this Court, the opinion being written by the then Chief Justice, concurred in by the other members of the Court, Associate Justices Stabler, Carter, and Bonham, was filed, and thereby the appeal of the sole appellant, Bankers' Trust Company of New York, was sustained, and the orders of Circuit Judges Stoll, Ramage, and Grimball were reversed.

Within the time prescribed by the rules of the Court, the plaintiffs-respondents, and defendants-respondents, Arcadia Mills and John Z. Cleveland, by their attorneys of record, filed a petition for rehearing. No petition for rehearing was filed on behalf of the defendant-respondent South Carolina National Bank.

The petition for rehearing has given the Court much concern. At the suggestion of the Court, counsel for all the parties have submitted proposed orders, thought by them necessary and proper in the circumstances, for our consideration in connection with the petition for rehearing. An order proposed by the counsel for respondents, both plaintiffs and defendants, including counsel for South Carolina National Bank, looks to a sale of the property of Arcadia Mills, involved in the litigation, as a "going concern," so as to avoid the necessity of having the mill closed, which in all likelihood, would result in great losses to those financially interested in the property, and would throw out of employment the hundreds of operatives employed in the mill, a condition to be avoided, if possible, in these times of depression when so many people are already without employment.

The Court has been very much impressed with the attitude of counsel in the case, for all of them, while seeking diligently to protect the interests of their respective clients, have appeared at all times to be willing to co-operate in carrying

out the desire to have the mill property sold as a "going concern."

We have been impressed, too, with the matters, to which our attention has been directed, in the concluding language of that petition as follows:

"Our statute provides that a receiver may be appointed for a corporation when it is in imminent danger of insolvency. Notwithstanding the Court's holding that the record shows ample assets to pay debts, we would respectfully remind the Court that the book values reflected by the record under conditions then and now obtaining are little more than a name. To advertise this Mill for sale under execution cuts off credit, paralyzes operations, destroys all equities of stockholders and general creditors and precipitates a perhaps avoidable insolvency with all of its train of distresses, disappointments, deprivations and suffering. Is it wrong to prevent this result? Is not the power of a Court of equity equal to the need which evokes it? Should the Court limit its power for good when the adjudicated cases, as it seems to us, do not compel it?"

The Court, after due consideration, has concluded that it is not necessary to have a reargument of the case, or to grant the petition for a rehearing. The Court is of the opinion, however, that its former judgment should be altered in some respects, and that the former opinion, as filed, should be modified as will hereinafter appear.

We adopt and adhere to that part of the opinion, which includes a very full statement of the facts, expressed in the following language:

"Arcadia Mills is a corporation, created under and by the laws of South Carolina, situate at Spartanburg, S. C., and engaged in the manufacture of cotton goods. Bankers' Trust Company is a corporation of the State of New York, its principal place of business at the City of New York, and is engaged in business as a banker.

"December 30, 1932, the Bankers' Trust Company, which we shall call the trust company, obtained judgment against the Arcadia Mills, which we shall call the mills, in the United States Court for the Western District of South Carolina, in the sum of $237,048.17. Execution was issued and levied upon certain money in bank, cotton, and other personal assets of the mills. January 2, 1933, an action was begun by certain stockholders of the mills on their own behalf and in behalf of such other stockholders as should come in and join with them, against Arcadia Mills, for the purpose of having the Court take full and complete charge of the property and operations of the defendant, through a receiver appointed by it, with the usual powers of such receivers to protect, preserve and operate the property for the benefit of all interested therein, and to secure an orderly and advantageous liquidation thereof to the end that a multiplicity of suits may be avoided, all creditors accorded just and equitable treatment, and the assets protected and preserved and the character of going concern be saved to the defendant, together with the added value accompanying that character; that all creditors be called in and permitted and required to set up their claims in this proceeding and enjoined from proceeding otherwise, or in any wise attempting to sell, attach, take charge of, or dispose of the property and assets of the defendant, or any part thereof or subjecting the same or any part thereof to sale or disposition otherwise than as may be ordered by this Court in this proceeding, and for any other relief that may be just."

"The same day the defendant answered the complaint, admitting the allegations thereof and joining in the prayer for the relief asked. For further answer it alleged that judgments had been obtained against the mills by South Carolina National Bank in the sum of $140,000.00; by John Z. Cleveland in the sum of $16,272.00; and by Bankers' Trust Company in the sum of about $237,000.00; that the last-named creditor issued execution and attached the bank account of

the mills, its cotton, and cotton goods; that the necessary effect of these is to cause the defendant to suspend its operations unless the Court will take charge of the property in the interest of all parties and devise a means of continuing it as a going concern; that its present operations are financed by a sound selling house which advances against cotton and finished goods to the extent of two-thirds of their invoiced value and has assured the mills that it is willing to finance an operating receiver upon the same basis if the receivership personnel is as satisfactory to it as is the present arrangement.

"Therefore, defendant joins in the prayer of the complaint, waives the statutory notice, and consents to the present hearing.

"The same day Judge Stoll, presiding in the Seventh Circuit, signed an order by which he appointed a temporary operating receiver with power and authority to continue the operation of the mills, and vested him with power to borrow money, buy cotton and supplies, and make such other contracts as may be reasonably necessary to continue the operation of the mills till the further order of the Court. To secure the repayment of the sums so borrowed by pledging the cotton, supplies, stock in process, and the output of the mills while they are operated by him, and to apply the proceeds of the goods sold to the liquidation of the sums borrowed. He appointed H. A. Ligon temporary receiver with the aforesaid duties and powers, and required him to give a bond of $1,000.00. The Bankers' Trust Company, South Carolina National Bank, and John Z. Cleveland were made parties defendant with leave to plead.

"The matter was continued to January 16, 1933, to be taken up before Judge Ramage, who would then be presiding in the Seventh Circuit.

"The trust company in due time served its answer which it is not necessary to set out in detail.

"At the hearing before Judge Ramage, Montgomery & Crawford, Inc., with the consent of defendants were allowed

to intervene as a plaintiff as an unsecured creditor on behalf of itself and other unsecured creditors of the mills.

"The Court heard the pleadings and affidavits affecting the qualifications of H. A. Ligon for receiver, and petition of many operatives for his appointment. After hearing arguments on questions raised as to the jurisdiction and power of the Court to appoint a receiver, and the propriety of such appointment, the Court indicated its opinion that there was not in the original complaint a case for receivership, but upon motion of attorneys for Montgomery & Crawford, Inc., permitted the complaint to be amended so as to allow Montgomery & Crawford, Inc., in behalf of itself and all other unsecured creditors of the mills, to serve an amended complaint so as to set out a creditor's bill and ask for the appointment of a receiver. The order directed that the matter be further heard before Judge W. H. Grimball at Union, S. C., February 27, 1933, 'and in the meantime in all respects except as above modified the order of January 21, 1933, made by Judge Stoll is continued in full force and effect.'

"No notice of intention to appeal from the orders of Judge Stoll and Judge Ramage were given within ten days after each of them was filed.

"In due time the amended complaint was served. Its caption is: 'Montgomery & Crawford, Inc., in behalf of itself and all other unsecured creditors of Arcadia Mills and W. S. Manning (then follows the names of the other plaintiffs as set out in the first complaint, who sue as stockholders in their own behalf and all other stockholders of Arcadia Mills who may come in and share expenses of the suit), plaintiffs, against Arcadia Mills, Bankers' Trust Company of New York, South Carolina National Bank and John Z. Cleveland, defendants.

"The complaint sets out in part:

"1. The corporate capacity of Montgomery & Crawford, Inc.; that it is a general unsecured creditor of Arcadia Mills in the sum of $859.31, which is past due; on information

and belief that there are other unsecured creditors holding past due debts in a considerable amount.

"2. Sets out the corporate capacity of Arcadia Mills.

"3. That since the organization of the mills in 1903, it operated successfully and paid dividends up to June 30, 1930; invested earnings in plant enlargements and improvements to approximately $1,500,000.00. That after charging off depreciation it has an equipped, up to date, and operating manufacturing plant of the book value of $1,161,000.00; in addition it owns $125,000.00 of stock in Fairforest Finishing Company and a note of that company in the sum of $40,000-.00; a stock of goods in its company store of the approximate value of $25,000.00, and has cotton, stock in process and finished goods (all pledged to the selling agent to secure advances for operating capital), and waste, supplies, and fuel that maintain a level book value of approximately $110,000-.00.

"4. That since June, 1930, the mills, in common with all other textile plants in the Piedmont Carolinas, has felt the effects of the depression and has sustained inventory losses; its operations require credit and it must constantly borrow money to finance cotton buying and to pay rolls.

"5. That the mill has 50,000 spindles; it owns the village, where it furnishes houses to its employees numbering 600 or more, and to whom it furnishes employment.

"6. That it owes about $400,000.00 which is not in normal times excessive, and under reasonable economic conditions is not so excessive as to bring about insolvency.

"7. Sets out the debt to Montgomery & Crawford, Inc., which was incurred for parts and mill supplies, no part of which has been paid.

"8. That defendant Arcadia Mills was heavily indebted to numerous general creditors, was embarrassed financially; was without assets convertible into cash, or usable for borrowing under conditions obtaining, was unable to pay its debts upon the basis of present sale values; up to within four

months of this proceeding, no general creditor had been given, or permitted to obtain, a lien or other advantage, or preference or priority in distribution of assets if a sale of the property should be necessary to pay the debts.

"9. That the mills on September 9, 1932, permitted South Carolina National Bank to obtain against it a judgment by default in the sum of approximately $141,000.00; about November 27, 1932, the mills permitted John Z. Cleveland to obtain against it a judgment by default in the sum of approximately $16,000.00.

"10. That about December 29, 1932, the Bankers' Trust Company of New York obtained, in the federal court for the Western District of South Carolina, a judgment against Arcadia Mills in the sum of approximately $237,000.00; that the mills is in good faith appealing from that judgment.

"11. That when these judgments were obtained, or permitted, these creditors and the mills knew that the mills was in dire financial straits and could not pay its debts; that in the conditions then and now prevailing its property would not bring enough to pay its debts and these judgment creditors would thus have a preference over other creditors.

"12. That the Bankers' Trust Company caused execution to be levied on the bank account, cotton, cotton goods, and products of the defendant Arcadia Mills; that the mills can operate only by securing the money for cotton purchases and pay rolls by pledging cotton and cotton goods to its selling agents; that because of such levy the mills was forced to shut down.

"13. That it is the custom and is necessary in the sale of cotton goods to make sales contracts for goods to be manufactured and delivered in the future; that it is necessary to this end that continued operation of the mill be assured; that the character of 'going concern' is a valuable asset to the mills, which will be preserved by continued operation and assure its satisfactory connection with a capable and sympathetic selling house, ready and willing to finance its operations

It will also preserve the physical value of the plant and keep intact its labor organization and prevent the waste, deterioration, and dilapidation which would result from the shutting down of the plant.

"14. That if the judgment creditors levy repeated executions on the personal property of the mills, or are left in position to do so, so as to shut down the plant, a material asset which is available and preservable to the stockholders and general creditors will be destroyed, and render the insolvency of the mills not only imminent but inevitable.

"15. That plaintiffs are informed and believe that other general creditors contemplate obtaining judgments; it is essential to the protection of plaintiffs' rights and to the preservation of the property that this court take charge of the property through a receiver to insure an orderly winding up and liquidation of its affairs, for the benefit of all creditors, for the prevention of a multiplicity of suits; that the court enjoin the levy of any executions under existing or future judgments.

"16. That the plaintiffs, other than Montgomery & Crawford, Inc., and such other general unsecured creditors as may come in, are stockholders of the mills, owning approximately $350,000.00 of its stock, who bring this action on their own behalf and of all other stockholders who may come in and share expenses; that the stockholders have large and substantial interests in the mills which are endangered if judgment creditors are allowed to sell the properties under execution, which may be saved through an operating receivership maintaining the property as a going concern.

"The prayer of the plaintiff Montgomery & Crawford, Inc., is for judgment on its debt; that all other creditors be called in and required to set up and establish their debts, and be enjoined from proceeding otherwise than in this action; and from attempting to levy upon or sell any of the property of the mills; that the court appoint a receiver to take charge and operate the property of Arcadia Mills; under the further

order of the court, and that such receiver be invested with all the usual powers to protect, preserve, and operate the property for the benefit of all interested therein. And, if it shall hereafter appear necessary or expedient, to wind up and liquidate the affairs and assets of Arcadia Mills in the interest of its creditors and all others in interest.

"Within due time, Bankers' Trust Company served its answer to the amended complaint, a synopsis of which follows:

"It has no knowledge or information sufficient to form a belief as to the allegations of paragraphs 1 and 7, and denies them; upon information and belief denies the allegations of paragraph 15; it admits the allegations of paragraphs 2 and 5.

"It admits the allegations of paragraph 3, and alleges that the former complaint, to which the complaining creditor has made itself a party, alleges larger valuations of the manufacturing plant than those alleged in the amended complaint; admits the former allegations of values showing at a conservative estimate the assets of Arcadia Mills to be $1,951,-000.00; it alleges upon information and belief that this is correct, and further, as alleged in the former complaint that the assets are 'many times' as great as the debt, about five times as large as the indebtedness, and about eight times the amount of this defendant's judgment.

"As to paragraph 4, it admits that the mills has suffered from the depression and has sustained inventory losses; it denies the other allegations of paragraph 4.

"As to paragraph 6, it admits that the amount of the indebtedness $400,000.00 is not excessive and is not enough to bring about insolvency, and alleges, as stated in paragraph 5 of the original complaint (adopted by the complaining creditor), that this amount is a reasonable debt to be carried by such a concern.

"As to paragraphs 8 and 9, it denies that the mills upon the basis of present sales values is and was unable to pay its debts; or that it was without assets convertible into

cash, or usable as collateral for borrowing, it admits that judgments have been obtained against the mills, and alleges that the other two judgments besides its own were planned, permitted, and intended to, and did, work a preference in favor of the other two judgment creditors against the trust company.

"As to paragraph 10, it admits that this defendant obtained judgment against the mills, and that the mills in good faith is appealing from that judgment, but denies that the grounds of appeal are valid and that the judgment will be reversed. (We may here note that pending this appeal, the judgment has been affirmed by the Circuit Court of Appeals.)

"It denies the allegations of paragraph 11 and alleges it to be a fact, shown by the former pleadings herein, that the creditors, other than the judgment creditors, represent a small proportion of the debts other than judgment creditors, to wit, about $6,000.00, which the mills can pay.

"As to paragraph 12, it admits that it caused execution to be issued upon its judgment, but alleges that it levied upon nothing but the account of the mills in Central National Bank of Spartanburg for about $1,203.00. That this defendant never contemplated, and does not now contemplate, that the operation of the mills should cease, or be interrupted, but has always intended that operations shall be continued until sale under execution can be made as going concern so as to effect a better sale in the interest of all concerned.

"As to paragraph 13, it has no knowledge or information sufficient to form a belief as to the allegations of this paragraph except as admitted; it admits that the character of going concern is a valuable asset of the mills. It denies that it has any intention to terminate or obstruct the operation of the mills; it is willing that it be a going concern till sold under legal process; it denies that it is possible to predict whether general conditions will improve or grow worse;

it denies that the parties have the right to throw on creditors the burden of a speculation of this character, especially in view of dissension among the stockholders, as evidenced by the suit of R. D. Blowers *et al.* against Arcadia Mills, in this court, which is referred to as often as may be necessary, and in view of the charges therein against H. A. Ligon and W. P. Ligon, president and vice-president and managing officers of the mills, which resulted in an order of the court which required them to replace moneys taken by them from the treasury of the mills and which enjoined them from further use of the moneys of the mills. In reference to the allegations concerning the selling agent, in the case in federal court, in which this defendant recovered judgment against the mills, the latter set up a counterclaim in large amount claiming special damages because of the loss of a valuable selling house connection, which as defendant is informed and believes is the 'strong selling house' referred to in the pleading, Joshua L. Bailey & Co. of New York, and introduced the testimony of H. A. Ligon and J. A. McPherson to show heavy decline in the physical condition of the plant during the past year by reason of the inability to obtain financial support from the said selling house for the purpose.

"As to paragraph 14, it admits that the judgment creditors are in position to levy execution and that it has levied an execution, but alleges upon information and belief, and upon the allegations of the original complaint herein that the judgment creditors, other than the Bankers' Trust Company, are 'co-operating' with the mills and willing to carry on; it denies the other allegations of this paragraph.

"As to paragraph 16, the allegations of this paragraph are denied except as admitted; it admits that the stockholders have an interest in the property, and if it is properly cared for, these interests can be preserved. It denies that there is any necessity to stop the operation of the mills, or to deprive 600 operatives of employment; in the enforcement of its judgment, this defendant anticipates the con-

tinued operation of the mills; it denies that its action is unnecessary or oppressive, and alleges that it is within its legal rights which should be protected by the courts. This defendant has no faith in the allegation that if the court will step in and operate the mills through a receiver, the dire consequences of a failure to do so, suggested in this paragraph, will follow. This defendant denies that there are other creditors whose debts will be lost if this defendant is permitted to enforce its judgment by sale.

"As to the other allegations of the amended complaint, not admitted or denied in this answer, the defendant has no knowledge or information sufficient to form a belief.

"For further defense and objection:

"1. That no creditors' bill (the supposed main cause) and no equitable relief incident thereto can be had at the demand of simple contract creditors without a lien because: (a) It is not shown that the remedy against this defendant's judgment is exhausted, but the contrary; (b) it is not shown that simple contract creditors have exhausted their remedy at law, but the contrary is true; (c) it is not shown that such remedy at law is 'useless,' or not 'adequate' which is essential and jurisdictional—and the contrary is true.

"2. If such main cause of action (creditors' suit) were stated, it is, as a matter of fact, and on its face and obviously, collusive, and not a real controversy, there being no contested issues between such creditors and the mills.

"3. Such main cause of action (creditors' suit, with injunction and receiver) cannot be maintained by the parties-plaintiff with the connivance of the mills, or without such connivance and thus obtain a judicial 'stay-law' in order that a business may be continued with immunity from its creditors; this would be like asking the court to hinder and delay unwilling creditors while it carries on with their money the business in whose speculative results only the stockholders are interested, in violation of the statute of Elizabeth.

"4. That a receivership is a purely ancillary remedy, and cannot be maintained, as plaintiff seeks to maintain it, without a main cause to which it is incident.

"5. That a court of equity will not declare and enforce a 'moratorium' for a business concern alleged to be solvent; and has no power to, and will not, appoint a receiver for such concern in order to prevent its creditors from maintaining and enforcing actions for the recovery of their debts; this would be to hinder and delay creditors contrary to the statute of Elizabeth.

"6. The power to appoint a receiver is discretionary and should be exercised with great care and only in a clear case.

"7. Equitable relief in this case would be improperly granted, there being no case on the facts.

"8. There is no duty resting on the court of equity to nurse sick business corporations. (Especially those claiming solvency.)

"9. A receivership upon such grounds would be improperly granted; the Bankers' Trust Company never intended to interfere with the operation of the mills, and will agree that they continue until offered for sale under execution of the judgment of the federal court.

"10. No cause of action is stated for the stockholders, it not being shown that the mills' remedy at law is not exhausted, but the contrary; nor that such remedy at law is 'useless' or not 'adequate.'

"11. If the main cause of action was stated, it is, as to the stockholders, as a matter of fact, and obviously, collusive and not a real controversy, there being no contested issue between them and the mills.

"12. There is no main cause of action, and an action for receivership merely cannot be maintained by plaintiffs without such main cause.

"The Arcadia Mills answered the amended complaint as shown by the following synopsis:

"1. It admits all the material allegations of the amended complaint.

"For further answer, it alleges:

"(1) That Arcadia Mills is a textile corporation employing about 600 operatives for whom and their families it furnishes houses in its mill village; the operatives and families amount to more than 2,000; that during the depression it has operated at a diminishing loss, and being unable to pay off its bank loans, judgments were taken against it as follows: South Carolina National Bank for $140,000.00; John Z. Cleveland for $16,272.00; and Bankers' Trust Company for about $237,000.00.

"The last-named judgment was recovered December 29, 1932, and execution issued thereon December 31, 1932; the bank account, debts, obligations, and moneys of the mills in the custody of the Central National Bank, and all cotton, the property of the mills, and all its cotton goods and products were attached thereunder. The necessary effect is to cause the mills to suspend operations unless the court will take charge of the property and preserve to it the character of a going concern; that its present operations are financed by a sound selling house which has assured this defendant of its complete willingness to finance an operating receiver upon the same basis providing the receivership personnel is as satisfactory to it as is the present management.

"(2) That by resolution duly passed by the directors of the mills on January 2, 1933, the proper officers of the mills were directed to file an answer on its behalf joining in the prayer of the complaint for the appointment of a receiver.

"(3) That as this defendant is informed and believes irreparable injury would be done to the unsecured creditors of the mills and to its stockholders should the court deny the relief prayed for in the complaint.

"The answer of South Carolina National Bank of Charleston sets up its judgment as a prior lien to that of John Z. Cleveland and the Bankers' Trust Company. That in bringing this suit this defendant exercised its clear legal right and is entitled to whatever priority is thereby attained.

"2. That it is informed and believes that the debts due it, John Z. Cleveland, and the Bankers' Trust Company constitute practically all the indebtedness owing by Arcadia· Mills, and that the debts held by other parties would not exceed $10,000.00.

"3. That the lien of this defendant, by virtue of its judgment and its right to enforce payment, should be preserved and no order for appointment of a receiver should be made except for the temporary purpose of preserving the property and business of defendant and operating the plant until a sale of the properties, or a reorganization of the corporation, can be effected. That the properties should be insured for the protection of the rights of the judgment creditors. This defendant denies that it has been oppressive in its dealings with Arcadia Mills, but has dealt fairly and kindly with it, and has no desire to sacrifice its property.

"The defendant John Z. Cleveland answered: 1. He admits the allegations of the complaint except those contained in paragraph 11 which he denies.

"2. Sets up his judgment for $16,274.50, obtained the 26th day of November, 1932, against Arcadia Mills, which has been duly entered and recorded and is a lien on the real estate of Arcadia Mills prior to that of the Bankers' Trust Company. That on bringing such action and procuring such judgment, he was within his legal rights and is entitled to whatever priority was thereby obtained.

"3. That the lien of his judgment and the right to enforce it should be preserved; however, this defendant is informed and believes that it is to the best interest of creditors and stockholders that a receiver be appointed to operate the mills until the further order of the court and that in the meantime the buildings be insured for the protection of the judgment creditors and their priorities. He denies that he has been oppressive in his dealings with the mills, but avers that he has dealt fairly and kindly with it, and now has no desire to sacrifice its property, but wishes that it be preserved

under a receivership for the benefit of stockholders and creditors alike.

"February 8, 1933, the attorneys for the trust company gave notice to the attorneys of the plaintiffs and of the defendants Arcadia Mills, South Carolina National Bank, and John Z. Cleveland, that they would move before Judge W. H. Grimball to vacate the orders of Judge Stoll appointing a receiver, etc., and the order of Judge Ramage continuing the receivership, to dismiss the receiver and to require him to account. The motion to be based upon the affidavit of Wilton H. Earle and the testimony to be taken upon the hearing. The grounds of the motion were:

"1. The orders were irregular and unlawfully granted because the remedy is ancillary, and no main cause of action is stated.

"2. Because the complaint did not state a real controversy, but the action was fictitious and collusive.

"3. Because a court of equity has no power to appoint a receiver of a solvent corporation for the purpose of hindering and delaying creditors in the enforcement of their legal rights in violation of the statute of Elizabeth.

"4. There was stated no cause for receivership because the parties have an adequate remedy at law, have not exhausted that remedy, nor shown that it is useless, and that such action was and would be improvident.

"5. Because if the court had power to appoint such receiver, the appointment was improvident on the facts; such power is discretionary and to be exercised only in a clear case.

"6. Because the receiver appointed in the orders, H. A. Ligon, is not a proper person to be so appointed: (a) Because he is president of the defendant mills; (b) because he is not a person of such character, discretion, and integrity as should be so appointed; (c) because H. A Ligon, it is clear, is not impartial or indifferent between the parties involved, especially toward this defendant Bankers' Trust

Company, with whom he was recently engaged in a litigation for Arcadia Mills.

"The affidavit of Wilton H. Earle set forth that he is one of the attorneys for Bankers' Trust Company, in its case in federal court against Arcadia Mills, in which the trust company obtained in January, 1933, judgment for about $237,000.00. That the instant action was brought January 2, 1933, by W. S. Manning and other stockholders in behalf of all stockholders against Arcadia Mills alone, and merely for the appointment of a temporary receiver. A temporary receiver was appointed the same day. Deponent, for Bankers' Trust Company, objected to such appointment, because: (a) There was no proper case for a receivership; (b) that H. A. Ligon was not a proper person to be appointed. Deponent asked for time to prepare and present the case for hearing on behalf of the trust company; Judge Stoll signed the order making H. A. Ligon temporary receiver, and making judgment creditors parties with leave to answer. The case was made returnable before Judge Ramage January 16th. The trust company served its answer and Judge Ramage stated in open court that there was not a case for a receivership presented by the stockholders; he permitted the complaint to be amended by allowing Montgomery & Crawford, Inc., in behalf of itself and all other unsecured creditors of the mills, to become parties-plaintiff and to serve amended complaints, which they did. Deponent verifies the allegations of the attached motion in detail.

"February 21, 1933, the trust company's attorneys served upon plaintiff's attorneys a demurrer on the following grounds:

"As to the complaint of the stockholders:

"1. Because no main cause of action on their behalf is stated, and the equitable relief sought is ancillary.

"2. Because of improper joinder of the stockholders, and the creditors, the stockholders not being proper parties in a creditors' bill.

"3. Because of improper joinder of stockholders with any alleged cause of action of any creditor or creditors based on a debt of the corporation, the stockholders having no interest therein.

"As to the complaint of the creditors:

"1. Because an action at law on alleged debt of the corporation cannot be brought by the creditor and maintained by bill in equity, but only by action at law.

"2. Because separate actions for debts of the defendant corporation to various creditors would be improperly joined.

"3. Because of the improper joinder of the stockholders and creditors in a creditors bill in which the stockholders have no interest.

"The matter came on to be heard before Judge Grimball at Union, February 27, 1933.

"It was stated in open Court by counsel for Bankers' Trust Company that when its levy was made it was not the intention of the trust company that the mills be closed; and the deputy marshal was instructed to levy only on money in bank, cotton and cotton goods in the hands of warehousemen. It was further stated in open Court by counsel for the trust company that it did not intend to close the mills down in the future prior to a sale under execution and asked that if the action be dismissed the Court include this agreement in its order. Documentary evidence in support of these statements was introduced.

"The officers and agents of the mills were not informed of the instruction by the trust company to the officer making the levy.

"H. A. Ligon testified to the successful operation of the mills during the temporary receivership, showing a gain of about $11,000.00 before depreciation, of $3,000.00 after taking off depreciation. He testified that the unsecured debt of the mills, not in judgment, was about $20,000.00, and unpaid taxes about $29,000.00. That when the execution

was levied on cash, cotton, and cotton goods it was impossible to operate.

"At the hearing before Judge Grimball, ten unsecured creditors, holding claims amounting to about $7,500.00, intervened as plaintiffs.

"After argument, Judge Grimball refused to vacate the orders appointing a receiver, overruled the demurrer, and announced his decision to appoint John A. Law and H. A. Ligon receivers of Arcadia Mills, and on February 28, 1933, signed and filed an order to that effect. This order gives to the receivers thus appointed, 'all the usual powers of receivers, and also with power to continue operation of the Mills, buy cotton and supplies and make such other contracts as are usually and reasonably necessary to the proper continuance of operations, including the borrowing of money to finance current operations from its selling agency connection, and to secure the repayment of sums borrowed by pledging cotton, supplies, stock in process and manufactured products, and to apply the proceeds of the sales of goods to the liquidation of the sums borrowed.' The receivers to give a joint bond in the sum of $5,000.00, and to receive a monthly salary on the basis of $5,000.00 each per annum. The order provided that creditors be called in and prove their claims in this action and all creditors were enjoined from bringing separate actions.

"From these orders the defendant Bankers' Trust Company appeals to this Court upon five exceptions relating to the orders of Judge Stoll and Judge Ramage, and eighteen exceptions relating to the order of Judge Grimball. It is not necessary to set these out in detail because they are in substance fully stated in the various motions, demurrer, and answer of the appellant. They will not be discussed seriatim, but will have attention.

"It is suggested by the respondents that there was no appeal from the orders of Judge Stoll and Judge Ramage, because no intention to appeal was given

within ten days after the filing of the orders. This preliminary matter may be disposed of here.

"Section 777 Code Civil Procedure 1932, provides that: 'Upon an appeal from a judgment, the court may review any intermediate order involving the merits and necessarily affecting the judgment.'

"In the case of *Morgan v. Smith,* 59 S. C., 49, 37 S. E., 43, 44, this Court said: 'On appeal from such final decree, it is competent for this court to review the intermediate decree of Judge Klugh, as such decree necessarily affected the final decree.' *Citing Hyatt v. McBurney,* 17 S. C., 143; *McCrady v. Jones,* 36 S. C., 174, 15 S. E., 430.

"It is patent that the orders of Judge Stoll and Judge Ramage affect the merits of the case, and necessarily affect the judgment rendered by Judge Grimball. Indeed, they are the basis of his decree, which continues in force the operations which the intermediate orders provided for. The contention is without merit."

Originally, it seemed to this Court that the respondents, both plaintiffs and defendants, advanced the sole theory that it was proper for a Court of Equity, through receivership, to take charge of Arcadia Mills, an industrial corporation, and have its business and affairs continued and operated under orders of the Court for an indefinite period of time, allowing the receivers to make obligations and contracts, even if such course resulted in hindering and delaying judgment creditors from exercising their rights and enforcing the collections of their just obligations. The Court did not, and does not now, agree with all those propositions. We stated in the former opinion, and we now repeat:

"It is said in the case of *Ex parte Maplecroft Mills,* decided by the District Court of the United States for the Western District of South Carolina, reported in 218 F., 659, 666, that the province of the Court of Equity in a proceeding of this nature, is, 'to take possession of the assets of an insolvent corporation for the benefit of its creditors and

forthwith to proceed to wind up, liquidate, sell out, and distribute all the assets among the parties entitled. * * * '

"It seems unnecessary to cite other authorities. It is manifest that this creditors' suit does not show any ground upon which a court of equity would be justified in taking charge of the property and assets of the mills and operate them for an indeterminate period under the orders of the court.

"There grew up a habit of 'friendly suits' brought wholly to procure the protection of the courts for corporations and other businesses in danger of going on the rocks through mismanagement, and other causes. The ends in view were usually accomplished by procuring the appointment of a receiver to take over the assets and property and manage them under the orders of the court. Such proceedings are no longer in favor with the courts.

"As was said by our Supreme Court in the case of *Southern Trust Co. v. Cudd,* 166 S. C., 108, 164 S. E., 428, 429: 'Before entering into a further discussion of this appeal, we may say that we fail to grasp the eagerness of the plaintiff for the appointment of a receiver. Its debt of less than $3,000.00 was admitted by the answer, and judgment at once could have been taken on the pleadings.. Execution could have long since been issued, and the plaintiff could have realized its debt out of the property of the defendant, which, according to the uncontradicted return of the defendant, is worth vastly more than all indebtedness.' "

"How striking is the parallel of facts in that case with those in this case.

"The facts in the case of *Ex parte Maplecroft Mills, supra,* are also in strong similarity to those in our case and, hence, the language of the Court is of especial aptness and importance. We may therefore be pardoned if we quote at some length from it:

" 'An inspection of this complaint in itself would justify the characterization that for a proceeding in equity it is one of a very anomalous kind. There is no distinct equitable

ground for the jurisdiction of a court of equity alleged. The proceeding is not brought nominally to liquidate the corporation as insolvent and marshal and distribute its assets. It is not brought to enforce a lien of any kind. It does not expressly and in words purport to be brought because the corporation is insolvent and the assets must be preserved and marshaled and distributed and sold for the benefit of its creditors. It does not allege a single controversy or disputed question to be adjudicated by a court. There appear to be no antagonistic interests or parties. The court is not asked to do anything of a judicial nature. It is brought, according to the theory of counsel, only in order that the court shall do what is styled conserve the property of the corporation and continue its business. In other words, the proposition of plaintiffs in the state court is that the court of equity, where the stockholders of the corporation cannot carry it on successfully, shall take possession of its assets and carry on an unsuccessful business, in the meanwhile preventing outside creditors or persons having legal claims from asserting in another proper tribunal their just claims. The court of equity is supposed, under the theory of this complaint in the state court, to act as the King of England was supposed to act in case of charitable corporations as *parens patriæ*. An industrial corporation—not a public service corporation—but an industrial corporation, carrying on business in like manner as an individual for the profit and benefit of the corporation and of its stockholders, finds that it cannot carry on business profitably or successfully. The stockholders in charge have been unable to carry on the business successfully; they have a large number of contract obligations which it does not suit them to meet, or which they are unable to meet, but which if the holders are allowed to prosecute or to assert their legal rights will put an end to the corporation carrying on its business. They therefore appeal to a court of equity to do that which they themselves have not been able to do, that is, to carry on the business of the corporation successfully, and further to do

that which they themselves have no legal right to do, that is, prevent outside persons having legal claims from enforcing them for an indefinite period, and, to accomplish the purpose of carrying on the corporation's business, that the court of equity should do that which the corporation in no respect had the power to do, viz., create an artificial credit by creating prior liens over existing obligations. That is to say, that a court of equity should allow its receivers to carry on the business and to borrow to the destruction of existing mortgages or other liens or the interests of other existing creditors for the purpose of preserving and conserving for stockholders the business which has proved to have been so unsuccessful.

" 'There is no jurisdiction in the court of equity to perform any such task as this. A court of equity does not exist for the purpose of operating industrial and manufacturing enterprises. * * * There is no known authority or power in a court of equity to take possession of the property not for the purpose of granting and decreeing some definite relief, but for the purpose simply indefinitely, for no fixed purpose, of operating the property and creating liens thereon to the destruction of other interests,' etc.

"If it be said that this case is not controlling authority, it may be said that it is powerfully persuasive in its clear cut analysis of the powers and duties of a court of equity in the appointment of a receiver in a case closely akin in point of fact to our case.

"See, also, interesting opinion of Bourquin, U. S. District Judge, in *May Hosiery Mills, Inc., v. F. & W. Grand 5-10-25 Cent Stores,* 59 F. (2d), 218."

It appears now, however, that the respondents, both those who are plaintiffs and those who are defendants, are willing for a reasonably immediate liquidation of the affairs of the Arcadia Mills, so that the judgment creditors may, through some proper Court process, collect, as early as possible, the amounts due on their respective judgments. As indicated in the former opinion, a Court

of Equity may order a receivership when a corporation is insolvent, or in imminent danger of insolvency, when such receivership is for the purpose of a *bona fide* liquidation of the affairs of the corporation, and the protection of the rights of creditors, according to their respective priorities (Subdivision 4, § 584, Code of 1932).

Construing the original and amended complaints in the cause, favorable to any right that the plaintiffs and the defendants-respondents may have, with the concession now made by their counsel, the Court is inclined to the view, and does hold, that those pleadings are such as to justify the construction that the plaintiffs sought a receivership for the purpose of a *bona fide* liquidation of the affairs of the Arcadia Mills, if they could not obtain a receivership of the character they most desired, one to permit the operations of the mill to continue without hindrance on the part of the judgment creditors. With that idea in mind, we have gone further into the case. While a Court of Equity should not often endeavor to obstruct a Court of law in its effort to help a judgment creditor to collect his honest obligation, a Court of Equity may, very properly, in the interest of justice and for the protection of the judgment creditor, take steps to assist him in the collection of his obligation.

By Section 4 of Article 5 of the Constitution, this Court has appellate jurisdiction in cases of chancery, and it is given the right to review the findings of fact as well as the law, except where the facts are settled by a jury and the verdict is not set aside. The Constitution has laid no restriction upon the power of this Court to hear appeals in equity cases, both as to the law and the facts. *Ex parte Carolina National Bank (Homestead Building, etc., Ass'n v. Parker)*, 56 S. C., 12, 33 S. E., 781. The word "appellate," as used in the Constitution, was intended to express the idea of full review of all phases of a case, law and fact. *Sandel v. State*, 128 S. C., 178, 122 S. E., 571. This Court has the power to either affirm in whole, reverse

in whole, or modify a decree of a Circuit Judge, sitting as a chancellor in an equity case.

From the record in the case, and from the showing made on the petition for rehearing, we find in addition to the facts referred to in the former opinion, and already mentioned in this order, certain other matters of fact, hereinafter adverted to, which do not appear to be disputed.

For more than a year, the property and business of Arcadia Mills have been in charge of receivers appointed by the Circuit Court. These receivers, under the authority of the Court, have been operating the mill and have, in the due course of said business, necessarily entered into various transactions. The Court understands, however, that there are no outstanding claims against the receivers, except such as have arisen for labor and supplies, in the aggregate a relatively small amount and none of them are of more than thirty days' standing. Provision should be made for all claims of this character. Furthermore, as suggested, the dissolution of the order of receivership without making provision for the continued operation of the mill would be followed by levies under the executions, and this inevitably would result in closing the mill, thereby throwing out of employment hundreds of persons, and subjecting them and their helpless families to much suffering. Furthermore, it appears to the Court that it is of prime importance for all parties concerned that the operatives who run the mill should be kept together as an organized force. If this organization should be disrupted by the closing down of the mill, it would result in great loss to creditors and all interested parties.

It is, of course, necessary that the property of Arcadia Mills should be sold for the payment of its debts. But it is proper that in directing such sale due consideration should be given to the matters hereinbefore indicated, and this Court, after much reflection and thought, has reached the conclusion that the operation of the mill and business of Arcadia Mills should be continued under the

charge of the receivers until a sale of the property can be had as hereinafter directed. The receivers, however, are directed to make only such contracts for the purchase of cotton, supplies, and other necessaries as will be needed for the conduct of the business, and their contracts for the sale of the property should not extend beyond what may be reasonably manufactured within the period of continued receivership as contemplated by this order.

It appears to the Court that a very large portion of the personal property owned by Arcadia Mills is so closely connected with the manufacturing plant that a sale of the entire property as a going concern would probably produce better results and be in the interest of all parties concerned. From this sale, however, there should be excepted for the reasons hereinafter stated, the notes of Fair Forest Finishing Plant and the stock in the same corporation.

It is, therefore, ordered and adjudged that the receivers of this corporation, after due advertisement, do offer for sale at public outcry before the courthouse in Spartanburg, all the property of Arcadia Mills, including land, buildings, machinery, stock in process, supplies, stock of merchandise, manufactured goods, cotton, choses in action, and all other property of Arcadia Mills, excepting, however, the notes against, and the stock in, Fair Forest Finishing Company. That any one desiring to bid at said sale shall first deposit with the receivers a cashier's check or a certified check on some bank in good standing, made payable to the receivers in the sum of not less than $10,000.00. That the successful bidder shall be required to deposit within two days thereafter, the further sum of $50,000.00, and to pay the remainder of the purchase price within thirty days from the date of said sale. That on compliance with the terms of sale the receivers do, and they are hereby directed to, execute to the purchaser a deed or deeds of conveyance for all of the property so purchased. That all checks of unsuccessful bidders be returned by the receivers. That if the purchaser should fail to comply with the terms of sale, that

the receivers be directed to resell the property at the risk of the former purchaser or purchasers and continue so to do until there shall have been compliance with the terms of sale, and that the receivers continue to operate the mill and business until the purchaser shall have complied and taken possession. That it shall be one of the conditions of sale that the purchaser shall be entitled to all moneys and other property on hand at the time when possession is turned over to him, and that he shall assume the payment of all current claims for labor and supplies contracted within thirty days prior to said time, and that he shall also assume any unfilled orders for the purchase or sale of goods. That the proceeds of sale, after paying necessary costs (not, however, including any commissions to the receivers or attorneys' fees) shall be applied to the payment in the following order, to wit:

(1) First, all taxes due and unpaid, including excise and property taxes and including any income taxes that may be due on account of the operations of the business while in the hands of the receivers.

(2) Next to the payment of the judgment of the South Carolina National Bank entered September 2, 1932, in the sum of $140,762.22, with interest.

(3) Then to the payment of the judgment of John Z. Cleveland entered November 26, 1932, in the sum of $16,274.50, with interest.

(4) Then to the payment of the judgment of Bankers' Trust Company in the sum of $237,048.07, entered December 29, 1932, with costs as taxed, and interest.

(5) Any balance shall be held by the receivers subject to the further order of the Circuit Court.

The receivers shall cause the sale to be advertised by publication once a week for three successive weeks in some newspaper published respectively in the cities of Spartanburg and Greenville and the advertisement shall contain a brief description of the property to be sold, showing the number of acres.

Any parties to the suit may become purchasers. Should any judgment creditor become the successful bidder he or it shall be entitled in settling for the amount of its bid, or for the deposit herein required, to use as a credit such amount as may be applicable to his or its judgment. Provided, however, that any prior liens shall in no way be affected thereby.

Among the claims which have been presented under the call in this case are two claims, one on the part of Fair Forest Finishing Company under a contract providing that Arcadia Mills should turn over such proportion of its product each year for finishing at prices stipulated. This claim is of a continuing nature, but the amount which is now claimed to be due is approximately $87,000.00. The other claim is in behalf of Reeves Bros. on account of the cancellation of an alleged contract for services. Both of these claims are in controversy, but they are of more or less serious import. The receivers are of the opinion that both of these claims could be settled, and Arcadia Mills relieved of all liability to both of these parties by transferring to them the note of Fair Forest Finishing Company for $42,-000.00, and interest, and the stock in Fair Forest Finishing Company of the par value of $125,000.00. The stock, while of a considerable nominal value, is admitted to be without much, if any, market value, and the receivers are of the opinion that it would bring very little if sold. The note of Fair Forest Finishing Company could, of course, be set off against any claim of Fair Forest Finishing Company against Arcadia Mills. From the statement of counsel, the Court is of the opinion that the proposed settlement would be in the interest of all parties concerned, and it is, therefore, ordered that the receivers be, and they are hereby, authorized to settle all liability of Arcadia Mills to Fair Forest Finishing Company and Reeves Bros., by transferring to them the said note and stock.

This case will be transmitted to the Circuit Court for the purpose of carrying out the terms of this order, and

that Court can make any order which may be proper in the premises. The receivers shall report to the Circuit Court all of their actions hereunder and shall fully account to said Court. It is the order of this Court that no receivers' commissions or attorneys' fees shall be paid out of any of the funds realized herein until after the judgment creditors shall have been fully paid. Should any funds then remain, the question of the allowance of receivers' commissions and fees to attorneys may be presented to the Circuit Court for determination.

The sale hereinbefore directed shall be had between the usual hours of sale on Wednesday, the 14th of November, 1934. If for any reason the sale should not be had on that date, or if a resale should become necessary, then the receivers are directed to make the sale on some succeeding Wednesday, after having advertised such sale as hereinbefore directed, and shall continue so to do until the property shall have been disposed of.

The former opinion and judgment of the Court are modified as is provided herein, and this order will be substituted in lieu of the former opinion; the decrees of Judges Stoll, Ramage, and Grimball are modified as herein indicated; and the case is remanded to the Court of Common Pleas for Spartanburg County for the purposes of carrying into effect the views herein expressed and the directions herein given.

The remittitur in the case will be held by the clerk for five days, exclusive of the day of filing, and within such time any party hereto may apply, if desired, for a rehearing, or for a modification of this order.